243 So.2d 493

**Kenneth BRICKLEY**

**v.**

**STATE.**

**8 Div. 143.**

Court of Appeals of Alabama.

June 25, 1968.

Rehearing Denied by Court of Appeals Oct. 8, 1968.

[Transferred to 8 Div. 4. Court of (Criminal Appeals of Alabama)

Reversed on Mandate Jan. 12, 1971.

**414**

W. A. Barnett, Florence, for appellant.

MacDonald Gallion, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

PRICE, Presiding Judge.

This appellant was convicted of the offense of murder in the second degree for the killing of Lori Ann Wyma, a four-year old child. He was sentenced to twenty years in the penitentiary.

The evidence tends to show that on Saturday, October 23, 1965, the child's mother left deceased and a younger child in defendant's care while the mother was at work in a restaurant. The mother left home about 1:30 in the afternoon and around 8:00 defendant telephoned her there was something the matter with Lori Ann. The mother's employer, a Mr. Thomas, drove her home and went in the house. He testified the defendant was on the bed with the little girl, "giving her mouth to mouth respiration." The mother jumped up on the bed and exclaimed, "Oh, my God, You have killed my baby!" The defendant replied, "No, I didn't. * * * She was playing out in the back yard and there was two little boys throwing rocks at her." There was no one in the house but the defendant and the two children. The only clothing the little girls were wearing was their underpants. Mr. Thomas observed a big bruised spot over one of Lori Ann's eyes and several bruised places on her chest. The mother rode to the hospital in the ambulance with the child. The witness drove the defendant and the other little girl to the hospital. The defendant said he was lying on the bed at the time the children were throwing rocks.

Dr. William S. Corley, a Huntsville physician, testified Lori Ann was dead on arrival at the hospital. In his judgment death occurred thirty minutes to two hours prior to the time she was brought to the emergency room. He testified: "Scattered over the body of the child, including the head, the chest and abdomen, or stomach area, the extremeties, including the legs and arms, there were multiple bruises of various sizes and one might say multicolored, some varying from a slight reddish coloration to quite purple or dark purple or blue. * * * The variations in color could have been accounted for by, generally speaking, one of two things." The difference in the age of the bruises themselves, or a difference in the intensity of whatever caused the bruises. * * * There was an area of about one inch or two centimeters in diameter in the mid forehead region which was raised and discolored * * *. As I stated before, the bruises were scattered in multiple areas over the body, including the anterior or front part of the chest wall and also in the upper abdominal region. The cause of these would be hard to determine from my standpoint. I could only assume that if they had been caused by a rock, as I said previously, there would have been some evidence of a breaking in the skin, if the rock had hit the child hard enough to cause a break." The doctor did not see a break in the skin on the body. "In examining the child there was a slight amount of distension or swelling of the abdomen which I failed to mention previously. * * * I remember having asked the gentleman (defendant) what had happened to the child. He explained to me that the child had been playing with other children during the course of the day and had gotten into a rock fight and the children had thrown rocks at the child, and that the smaller child had come in and told him that something had happened to Lori and would he come and see about her."

On cross examination Doctor Corey stated there was some bruising underneath both eyes, but no noticable swelling under either. He estimated the child's age as between four or five. He testified further: "Of course, the standard types of artificial resuscitation or respiration are basically the same, as you say, mouth to mouth or closed chest, pressing on the chest. If you narrow it to what I would do, I would give

mouth, to mouth. * * * The only difference in an adult and a child is the vigor or intensity with which one does it." There is no great danger in giving it to a child of tender years, so long as it is not done with too great intensity. " * * * the most likely damage in too vigorous artificial respiration to a child, or an adult as far as that is concerned, is a fractured rib. * * * with mouth to mouth resuscitation the only danger would be encountered again is too vigorous expulsion of air or expiration in the child's lungs and rupture some of the tiny air sacs. * * * Usually this is not given to the point of being permanent because this is usually to a mild degree and the lung sacs will close off themselves with time."

James Agnew, owner and operator of Agnew Ambulance Service, testified on October 23rd he made a call to an address on Stevens Avenue, arriving there about 8:20 in the evening. The defendant was standing in the driveway with a child in his arms. He took the child and put her in the ambulance and asked defendant what had happened. Defendant said she had been hit in the head with a rock. The child's mother rode in the ambulance to the hospital and told him the child's name was Lori Ann Wyma. He took the child into the Emergency room and laid it on the table. Dr. Corley was the doctor on call and he came in immediately and checked the child. The defendant came into the hospital with a little girl in his arms. In a conversation with defendant at the hospital about the dead child, the defendant told witness he had whipped her several times.

Mr. Van V. Pruitt, Jr., a toxicologist with the State Department of Toxicology and Criminal Investigations, after detailing his training and experience, testified he performed a post-mortem examination on the deceased, October 24, 1965. His external examination revealed the following:

"There was a large bruise in the forehead between the eyebrows and midline, which was accompanied by swelling. The left eye was swollen and there was evidence of bruising of the tissue of the eye. There were numerous or multiple smaller bruises, ranging in size from approximately one-quarter inch in diameter to one inch in diameter, located in the midline area of the chest. There was a somewhat semicircular area of bruising which also involved an abrasion located on the midline of the chest, but above the level of the sternum. There was an area of bruising which measured one inch in width and four inches in length in the right abdomen which ranged from the hip bone across the right abdomen to the pubic area. There was evidence of bruising on the right side of the chest, along with what we call the axillary line or the line running underneath the armpit. Both the right and left buttocks showed evidence of numerous bruises. There was a bruise measuring one inch by three inches extending on the back surface of the right upper leg, ranging from underneath the right buttock. There were also multiple bruises about the inner surface of the left forearm." There was only superficial broken skin, "which was the abrasion which I described externally, being involved in the bruise on the sternal notch on the midline. This would not actually be a puncture but what we call in common language a skinned place or a scuffed place, which is technically an abrasion."

* * * * * *

"Internally I noted that there was gross free hemorrhage within the abdomen, particularly about the upper right side, which was traced to a laceration, or what would commonly be called a tear, on the under surface of the liver. This ranged from the front of the organ to the back of the organ. There was also a tear in the posterior or back portion of the diaphragm, which is the muscle separating the chest from the abdomen." From this examination the witness determined the cause of death to be "hemorrhage of the liver resulting from

a force applied to the right side of the chest."

The Toxicologist stated that in his opinion a tear of the nature described would be caused by, "sudden very forceful pressure or blow applied to the right chest;" that even hard artificial respiration given to a small child would not have caused the tear, nor would a fall against a concrete block by a child dressed only in panties have caused it without breaking the skin.

On cross examination this witness stated the formation of the cartilage or bone in the rib section of a four year old child is not as firm as that on an adult. He stated the tear was in the left lobe of the liver and pointed out to the jury the location of the liver on a skeleton. The bruises varied in length of time of development. Some were 24 to 48 hours old and some were relatively immediate prior to death. It is possible, but not probable, that the bruises near the collar bone could have been caused by putting the hands on the chest trying to give artificial respiration. There was no damage to any organ except the liver. To some degree the distension of the abdomen was caused from the blood condition that was there.

On redirect examination the witness testified he had seen ruptures such as this in persons involved in auto accidents, aircraft accidents and one football injury. The witness was asked this question:

"Supposing you take a child of around 35 to 40 pounds, four years of age, and a blow was administered to the child in this area and that child had air in its lungs, what might be the result?"

The answer was, "If the blow was intense enough it could cause a laceration of the diaphragm and it could result in a laceration of the liver."

This would come about by:

"The air not being capable of being expelled from the lungs fast enough due to the intensity of the blow would create a pressure situation in the lungs or in the chest cavity which would force the diaphragm downward. If the force was great enough, or to the extent of the give of the diaphragm, it would tear and at the same time it would tend to force the liver downward and at the extent of the give of the teres ligament running underneath the liver the ligament would lacerate the liver." The witness stated on cross examination that it was his opinion that this condition could not be brought about by giving mouth to mouth resuscitation, at the same time using the hands on the lungs.

Kenneth Brickley, the defendant, testified he was 19 years of age in October 1965. The first part of the week preceding October 23, 1965, he was in Huntsville and that he went to Florence and came back to Huntsville Friday night, October 22nd. (It will be noted that throughout his testimony relating the events of the day of the child's death the defendant refers to the little girl's mother as "my wife." According to the evidence the mother was married to Lori Ann's father, George Wyma, of Chicago, Illinois, when the child died. Later a divorce was granted and on the date of trial she had married the defendant.)

The defendant testified he was sick and taking medicine on Saturday, October 23, and spent most of the day in bed. His wife reported for work at 12:30 and he was watching the children. They played in the backyard most of the day and he got out of bed several times to check on them. About 3:00 o'clock he noticed Lori was near some cement blocks in front of the garage, throwing rocks toward the street. At first he didn't see the youngest child, Donna, but when he went to the door he saw she was in the street throwing rocks at some little boys in the church yard across the street. He went back to the bedroom and put on trousers and a shirt and walked out to the street to get Donna. "She didn't want to come. I guess she wanted to play with the boys or whatever they were doing. Anyway, I told her she was going to come in

the house to go to bed for throwing rocks. At that time, you know, I paddled her with my hand. I just paddled her on her bottom. She went in the house. I called Lori also. I was going to make her go to bed too. The blocks is where she was at, or she had moved a little ways from them. So I got her by the hand and I paddled her also for throwing rocks with my hand." The children stayed in the house for about twenty minutes and went back outside. The youngest child, Donna, came in the house about dark. She was crying and said Lori was hurt. He dressed, went outside and found Lori lying on the ground face down. He shook her several times and called her name but she didn't answer. Then he rolled her over and she answered him. He got her on her feet and walked her into the apartment, undressed her and put her in bed with him. In a few minutes she began to cry and moan and groan. He asked what was the matter and she said she was all-right. She later said she was sick at her stomach and he took her in the bathroom and she vomited a little. He walked her back into the bedroom and lay beside her on the bed. A few minutes later she started moaning and groaning and then stopped. He noticed she wasn't breathing normally and he telephoned his wife. After calling his wife he began administering mouth to mouth resuscitation. He stated:

> "At the time I was administering artificial respiration in that manner the only way that I was taught to expel the air that is in the lungs is by pushing in whatever you call this part of your stomach * * * I don't know what you call it. I just know it's this part of your stomach, or right here in this soft place you push the air back out. In other words, you push in on your stomach, or about this area right here, and it pushes the air back out."

He did a lot of that. The child did not revive at any time after he started giving it artificial respiration. He never struck the child many times. He just paddled her on the bottom with his hand.

On cross examination the defendant stated he saw both little girls throwing rocks and also saw the boys throwing rocks. Mr. Thomas and Mr. Agnew didn't tell the whole truth. He never struck Lori all day except he paddled her once. He could not account for the bruises on her buttocks. A fall could have done it. Both children were rather easily bruised. He didn't really push hard on her body when he was giving artificial respiration. He was not married at that time. He married February 4, 1967. Her divorce was granted in August of 1966. Nancy Wyma and the two little girls were staying in his apartment. She was separated from her husband and was filing for a divorce. He wasn't living with her. There was only one bedroom and she and the children slept there. He slept in the livingroom on the couch.

The defendant, on cross examination, denied that he told the ambulance driver he whipped the child several times that day. When Nancy Wyma came into the room after he had telephoned her, she asked "what has happened to my baby?" She didn't say anything about he had killed her baby.

Nancy Brickley as a witness for defendant testified she was 22 years old and was the mother of Lori Ann Wyma. On the Thursday prior to the child's death the defendant said he felt better and would keep the children for her, but he later came by where she was working. His mother was taking him to Florence. His mother said the lady next door, Mrs. Whitt, was keeping the children. When she went home that night after work the children were in bed asleep, dressed in their long nightgowns. "Lori had her face turned toward the wall. It showed this side of her face. She had one great big red hand print there." In about fifteen minutes the lady next door came in. "So I * * * asked the lady next door if she would keep an eye on them while I went and made a phone call. I went and called Ken's mother down at Florence. I talked to Ken at this time. I

asked him if he had hit Lori. I said 'the lady next door told me.' And he said, 'No, like that. He said, 'What's the matter with her?' I told him about the mark. He said, 'No, I haven't.' He said, 'She was all right when I left her.'

On Friday morning the children were in a good mood and were jumping up and down on the bed. She spanked Lori for jumping on the bed and spanked Donna for jumping off the couch. She spanked them with her hand. The little girls spent that day at the babysitter's. The defendant came back about 1 o'clock Saturday Morning. She didn't notice any bruises on Lori. "Lori Ann always bathed herself. She would bathe herself and she would dry herself because she was real modest. She would put her panties on and her undershirt and then I would come in." There was an old couch in the garage with an old chair on top of it. There were also boards and boxes and all kinds of junk. In front of the garage there were cement blocks. She spanked the children for going in the garage but they were playing with a little girl and wouldn't mind. She spanked both Lori and Donna on Saturday morning for jumping from the blocks. She left for work about 1:30 and later received the phone call from defendant. Mr. Thomas said he would drive her home. When they went in defendant was over Lori giving her mouth to mouth resuscitation. She asked, "What happened to my baby?" Ken said, "She stopped breathing. Go call an ambulance." She ran to a house close by and called an ambulance and took Lori to the hospital. When she came home Donna had on a blue dress and Lori had on training pants. The witness did not say, "You have killed my baby." Mr. Thomas was mistaken when he said he heard her say that. She asked defendant what happened and pointed to the knot on Lori's head. He said some little boys had been throwing rocks at her. Donna had a black eye too. She was jumping on the bed that morning and fell and hit the bed. It was red at first but it turned blue.

On recross examination the witness testified that Donna was admitted to the hospital, she was told, for observation.

Several character witnesses testified on direct examination to defendant's good reputation. Each of these witnesses testified on cross examination that his knowledge was based on personal knowledge.

Doris Brickley, the defendant's mother, testified she lived in Florence in October, 1965. These children were in her home on the Monday before Saturday October 23, 1965. There was a breakfast bar with high stools in her kitchen. Lori fell off these stools on her buttocks several times. That same day the children were playing on the fender of an old car in the yard. She heard crying and Lori said Donna pushed her off into where the motor had been. They were also hitting each other. Donna was hitting Lori with a steel rod about the size of witness' finger. She brought the children to Huntsville on Monday afternoon. She saw them again on Thursday afternoon at the apartment in Huntsville. They were playing in the back yard with a neighbor's little girl. The defendant was lying on the bed and he was sweaty and very ill. She got him to go back to Florence with her to see a doctor. He left by bus to come back to Florence about 10 o'clock Friday night. She observed the children on Thursday and there were no hand marks either red or blue on the left side of Lori's face. She asked the lady in the next apartment if she would watch the children until the mother came home, and she said she would. At the time the children fell at her house on Monday before she brought them to Huntsville she did not punish them.

■ Appellant insists that there was no direct testimony that he struck the child in the chest to cause the injury resulting in its death, nor any circumstances shown from which it could be found that he committed this act, and that he was entitled to have the general affirmative charge given in his behalf or failing this, his motion for a new trial should have been granted. We have carefully considered the facts and circum-

stances, and the inferences to be drawn therefrom, and are of the opinion they were sufficient to go to the jury and to sustain the verdict of guilt. There was no error in refusing the requested general affirmative charge, nor in denying the motion for a new trial on the ground of the insufficiency of the evidence to support the conviction. De Silvey v. State, 245 Ala. 163, 16 So.2d 183; Brannon v. State, 42 Ala.App. 564, 171 So.2d 845.

■ The indictment charges in Count One that defendant killed Lori Ann Wyma by beating her with the handle of a wooden brush, and in Count Two that he killed her by beating her with his hand or fist. The evidence going to show what instrument was used in committing the offense is left in inference and was a question for the jury to decide. Therefore, Charges B and C, instructing the jury if they believe the evidence they will find the defendant not guilty under counts 1 and 2 respectively, were properly refused. McDonald v. State, 241 Ala. 172, 1 So.2d 658.

The principles of law contained in other charges refused to defendant, except those affirmative in nature, were covered by the trial court's oral charge or charges given at defendant's request.

Several grounds of the motion for a new trial assert that the rights of the defendant were prejudiced by the presence in the jury room of the bailiff in charge of the jury while they were deliberating. The affidavit of counsel for defendant in support of the motion reads, in pertinent part:

"This trial started on Monday, April 10, 1967, and testimony was taken until approximately 4:00 o'clock p. m. on Tuesday afternoon, April 11, 1967, the case was argued and the Judge charged the Jury and the Jury proceeded with its deliberation at approximately 5:15 p. m., April 11, 1967; that the Jury was kept out some hour or two and were called in and instructed and sent to the hotel for the night. The Jury was returned to the Courtroom by the Bailiff at 9:00 o'clock a. m. on the morning of April 12, 1967, and they were directed by the Court to return to the Jury room for further deliberation. During the course of the deliberation of the Jury at approximately 10:20 a. m. one of the Jurors stuck his head out of the door of the room in which the Jury was placed in deliberation and called the Bailiff by his first name. At that time I glanced at my watch and timed the Bailiff being behind the closed door with the Jury for eight minutes. The Bailiff returned to the Courtroom and went to the Judge's desk and picked up the large notebook from which the Judge instructed the Jury and began to turn pages in the book. About this time the trial judge returned to the Courtroom and after some conversation between the Bailiff and the Judge, which is unknown to the affiant, the Jury was brought back to the Jury box and given further instructions and then the Jury was returned to the Jury room for further deliberation and the verdict was returned by the Jury at approximately 11:00 o'clock a. m. on the 12th day of April, 1967. We do not have any knowledge of what the conversation was but it appeared to be highly improper and it was certainly prejudicial to the right of the Defendant on trial for his life."

There was also an affidavit signed by defendant in which he deposed:

"My trial started on April 10, 1967. On April 11, 1967, my case was argued and the Jury deliberated an hour and a half or two hours and was sent to the hotel for the night. They were instructed to not further consider my case until they were returned to the Courtroom. On Wednesday morning, the 12th day of April, 1967, the Jury was returned to the Courthouse by the Bailiff at approximately 9:00 o'clock a. m. They were instructed by the Honorable Court to return to the Jury room for further deliberation on my case. After the Jury had been out for more than an hour one of the jurors opened the door and called the Bailiff by his first

name and the Bailiff got up and went in the room with the jury. I saw my attorney glance at his watch when the Bailiff went into the room. I saw him glance at his watch again when the Bailiff came out of the room. It seemed that the Bailiff was in the room for a long time. Not being familiar with the Court procedure I did not know to check the time but I do know that he was in there for a long period of time. I did not see him supply the Jury with any cold drinks or any water or any necessity that they would need during their deliberation. I feel that the presence of the Bailiff in the room with the Jury was prejudicial to my rights."

The record shows that after the jury had deliberated for some time they were brought back into the courtroom and seated in the jury box. The following occurred:

"THE CCURT: Ladies and Gentlemen, I understand that you want some definitions re-defined to you. What definitions are those?

"JURORS: All of them, sir.

"THE COURT: You want the offenses re-defined?

"JURORS: Yes, sir."

Thereupon the court defined the four degrees of homicide and asked if this was the instruction the jury desired. A juror stated:

"One other one, Your Honor. Would you define malice?"

The court then instructed the jury as to malice.

■■ In felony cases any separation or misconduct of the jury or misconduct of the officers of the court which it appears may have prejudiced the rights of the defendant must be considered. Ordinarily where improper communications between a court officer and the jury is shown a presumption of injury arises with the burden then resting on the State to show that no injury resulted to defendant. Leith v. State,

206 Ala. 439, 90 So. 687; Miles v. State, 261 Ala. 670, 75 So.2d 479. No evidence was introduced by the state to rebut the affidavits of defendant and his counsel. But each case of conduct possibly influencing the jury must be judged by its particular facts. Bell v. State, 227 Ala. 254, 149 So. 687.

■ The bailiff should not have gone into the jury room while the jury was deliberating on its verdict, but it seems clear from the affidavits of defendant and his attorney and the trial court's action in further instructing the jury as shown by the record, that the jury wished to be informed on a point of law and the bailiff merely brought the matter to the court's attention. We consider there is not a sufficient showing of misconduct of the bailiff to warrant a reversal. There was no error in denying a new trial on this ground. We find no reversible error in the record.

Affirmed.

CATES, J., dissents.

ON REHEARING

PRICE, Presiding Judge.

■ Counsel for appellant insists that we are in error in holding the charges refused to defendant were covered by the court's oral charge.

Refused charge No. 4 was as follows:

"The Court charges the jury that the law presumes the defendant to be innocent of the offense charged in the indictment, and this presumption continues to go in favor of the defendant until the evidence convinces the jury beyond a reasonable doubt of his guilt, and you cannot find the defendant guilty of any offense charged in the indictment until the evidence in the case satisfies you beyond all reasonable doubt of his guilt, and so long as you or any of you have a reasonable doubt as to the existence of any of the elements necessary to constitute the of-

fense, you should not find the defendant guilty."

The same rule of law was fairly and substantially covered by the following portion of the court's oral charge:

"\* \* \* the burden of proof is upon the State of Alabama to satisfy you from the evidence beyond a reasonable doubt and to a moral certainty that this defendant is guilty before you can convict him. The Defendant enters into the trial presumed to be innocent and this presumption of innocence accompanies him, shields him and attends him and is evidence in his behalf and he is entitled to the benefit of this presumption until you are so satisfied from the evidence beyond a reasonable doubt and to a moral certainty that he is guilty of some offense of which he may be found guilty under this indictment. Of course, Ladies and Gentlemen, when you are so satisfied from the evidence beyond a reasonable doubt and to a moral certainty that he is guilty, then this presumption of innocence in his favor at that point would cease."

Gordon v. State, 268 Ala. 517, 110 So.2d 334.

Refused charges 34, 37 and 39 were as follows:

"34. The Court charges the jury that a person charged with a felony should not be convicted unless the evidence excludes to a moral certainty every reasonable hypothesis but that of his guilt; no matter how strong the circumstances are they do not come up to the full measure of proof, which the law requires if they can be reasonably reconciled with the theory that the defendant is innocent.

"37. The evidence against the defendant in this case is circumstantial, and his innocence must be presumed by the jury until the case proved against him is, in all its material circumstances, beyond any reasonable doubt; that to find him guilty, as charged, the evidence must be strong and cogent, and, unless it is so strong and cogent as to show the defendant's guilt to a moral certainty, the jury must find him not guilty.

"39. I charge you, that the humane provisions of the law are that a prisoner charged with a felony should not be convicted on circumstantial evidence, unless the same shows by a full measure of proof that the defendant is guilty. Such proof is always insufficient, unless it excludes, to a moral certainty, every other reasonable hypothesis but that of the guilt of the accused. No matter how strong the circumstances, if they can be reconciled with the theory of the innocence of the defendant, then the defendant is not shown to be guilty by that full measure of proof which the law requires. Unless you are reasonably satisfied from the evidence, beyond a reasonable doubt, that the defendant is guilty, then you should not convict him."

These charges were covered by the following portion of the court's oral charge:

"\* \* \*. The test of the sufficiency of circumstantial evidence in a criminal case is whether the circumstances as proven are capable of explanation upon any reasonable hypothesis consistent with Defendant's innocence and if they are capable of such explanation then the Defendant should be acquitted. The burden is upon the State and it is the duty of the State to show beyond all reasonable doubt and to the exclusion of every other reasonable hypothesis every circumstance necessary to show that the Defendant is guilty, and unless the State has done that in this case it would be your duty to acquit the Defendant. You must be satisfied to a moral certainty, not only that the proof is consistent with the guilt of the Defendant, but that it is wholly inconsistent with every rational conclusion, and unless the members of the Jury are so convinced by the evidence of the Defendant's guilt that they should each venture to act upon the decision in matters of the highest concern and importance

to their own interests they must find the Defendant not guilty."

This principle of law was also covered by written charge 38 given at defendant's request, which reads:

"38. I charge you, that before you can convict the defendant in this case, you must find from the evidence beyond all reasonable doubt that the circumstances surrounding the death of the deceased are consistent with the guilt of the defendant, and more than consistent with his guilt; that such circumstances are not sufficient to justify a conviction if they merely cause a suspicion of the defendant's guilt."

Application for rehearing overruled.

PER CURIAM.

Reversed and remanded on authority of Alabama Supreme Court Manuscript, Ex parte Brickley, 286 Ala. 546, 243 So.2d 502.